Elizabeth Willams-Clinton OK, the next argued case is number 17, 1333. RxOAB against activist Elizabeth LLC. Mr. Taylor. Good morning, Your Honors, and may it please the court. The main issue before this court is whether the claims should have been invalidated based on a few lines of conclusory expert testimony. Testimony that is without support in the prior art and that contains factual assertions that, even if credited, do not lead to the key claim limitation at issue. If it is acceptable to the court, I want to spend most of my time discussing this issue and reserve a minute or two, if OK, at the end to discuss the second issue that we focused on in our briefs, which relates to this question of whether a reference that teaches the way should have been considered. Now, just to set the stage a little bit, the invention at issue is a structural arrangement of known ingredients. Now, this new structural arrangement of the ingredients in the prior art resulted in a surprising effect. Now, the prior art disclosed materials such as the drug Suboxone. Suboxone included a number of ingredients, including citric acid and a number of other ingredients, along with the active ingredient. Did the record include any prior art at all that talked about using citric acid as a carrier? Not at all, Your Honor. In fact, citric acid had been known and used in pharmaceutical formulations for many, many years, and there was absolutely no reference that disclosed citric acid as a carrier. And in fact, the references that disclose this interactive mixture, which is the key claim component, including citric acid, and a citric acid carrier particle with the buprenorphine active ingredient adhered to it, that's the key structural limitation in Claim 6 that was wholly missing from the prior art, from the interactive mixture prior art, like the 443 patent that relied on by the court and the prior products such as Suboxone. Would it have been possible to micronize citric acid to put it in and that it wouldn't be in the interactive mixture, but it still would be in the tablet? Absolutely. That's why one of the reasons why it was, we believe, error for the court to assume that just the combination of a reference that disclosed citric acid not in an interactive mixture in a totally different form, like the Suboxone prior art with the 443 type prior art references that disclosed other interactive mixtures that did not include Suboxone to presume that when you combine those references, you would get the specific claim structure. And again, when we talk about the specific same claim structure, it's not just a formulation that comprises an interactive mixture with citric acid. It's a formulation wherein the citric acid is a carrier particle for the buprenorphine in the interactive mixture. And we believe that's one of the ways that the court erred in that it glossed over this key claim limitation. The claim limitation isn't just an interactive mixture that has citric acid in it, a formulation with an interactive mixture that has citric acid in it. It is a formulation wherein the citric acid is a carrier particle for the buprenorphine. Now, that was a key limitation in the claims. It's the reason why the invention has surprising activity, surprising bioavailability over the prior art. It's the reason why the claims were allowed over compositions such as Suboxone, which included the same key ingredients, citric acid, buprenorphine, naloxone and others, but in a different form. As I understood the district court's analysis, the district court said one of Vordener's felony art would have been motivated to use citric acid as a carrier because it's a pharmaceutically acceptable substance that's water soluble and it's the appropriate size. And therefore, it meets the definition of what a carrier would be as provided by the specification. What's your response to that? Yeah, that is, in fact, based on this Dyer testimony. Dyer was the expert by activists and that testimony is wholly unsupported in the prior art. Two important things in that testimony of the appropriate size. Now, there's no evidence in the prior art with regard to the size of any citric acid particles. No. The prior art references that included citric acid didn't have that citric acid in the particles. Let's say for a minute that I knew that I wanted citric acid to be the carrier. Let's just assume that. OK, then I could figure out what the right particle size would be, right? I mean, just I understand that you don't agree with that assumption and that there might not even be record evidence to support it. But assuming for a minute that I did know that I wanted to use citric acid as a carrier. Help me out. Technically, would one of ordinary skill in the art know how to make a carrier a particle size to make it a carrier? I absolutely do not disagree with that. You don't. You do not disagree. I do not disagree. But that's not that's not the issue at all. The prior art was replete with disclosures of interactive mixtures. Interactive mixtures had been known for 20 years. The key is that there was no interactive mixture that disclosed citric acid as an interactive mixture. And the references that did disclose interactive mixtures disclosed other things as the core. As as the as the of the interactive mixture, not not citric acid, like mannitol or like mannitol, like lactose, even like naloxone in the 443 patent. There's no disclosure of anything suggesting that citric acid would be used as a carrier particle. In fact, when you look at how citric acid was used in in the prior art, it's used for other reasons. And these references, like the 443 patent and suboxone, they suggest using citric acid in different ways. The 443 patent, for example, it also discloses that in these formulations there is this interactive mixture. There are things in the mixture, but many, sometimes most of the ingredients in the formulation, they're not in the interactive mixture. So it was, in our view, error for the court to rely on this one unsubstantiated statement by Dr. Dyer for support for this critical claim limitation. Especially when the prior art suggests that other materials, other ingredients are much more likely to be used as a carrier particle than citric acid. I mean, that, Your Honor, is the heart of our concern with the court's decision and the reason why we believe whether you analyze it as an error of law or whether the finding, the factual findings were clearly erroneous, that the decision should be reversed. Now, you'll likely hear from activists that there are other evidence in the record to support this claim limitation. Now, the court did find that there was a motivation to reformulate suboxone as an interactive mixture. Now, when the court found, made this finding, it referred to, again, this 4-4-3 reference. Reference that discloses interactive mixtures that don't have citric acid at all. Now, this finding as a general motivation to reformulate suboxone as an interactive mixture is not a finding of reformulating suboxone in the way that the citric acid is a carrier particle. And you don't challenge that finding on appeal. You don't challenge the finding that there was a general motivation to reformulate it into an interactive mixture. It's the particular way that you've claimed it that you're challenging, right? Our appeal on this issue assumes that fact, that there was a motivation. And even if the court assumes that there was a motivation to combine these references, it still doesn't get to this claimed element. Now, we do have issues with the court's analysis of motivation as it related to the 8-3-2 patent. And that's the issue that I wanted to get to in a minute, but let me just finish on the points that activists made. Now, activists said this first one, that there was motivation to reformulate suboxone. Now, that's not a substitute for a specific motivation to have a citric acid carrier with buprenorphine adhered to it. It's not. As we discussed before, the prior art didn't disclose a citric acid carrier at all. And in fact, the prior art that did suggest an interactive mixtures used other material. You'll likely hear activists say that citric acid would improve the bioavailability if it was placed into an interactive mixture. Well, the court relied on the 8-3-2 patent for that finding. Well, that patent doesn't mention interactive mixtures at all. And in fact, when the bioavailability was increased in that composition, it also resulted in an undesirable increase in the bioavailability of the second component in the composition. Would it make a difference in that bioavailability whether the citric acid was, or is there any evidence to show that it would make a difference when whether the citric acid was acting as a carrier or was micronized in the coating or elsewhere in the tablet? The 8-3-2 patent is not a tablet at all. It's a film. So there was, again, this is one of the references where the citric acid was not even in particular thought. So for the court to have suggested that that reference is a suggestion of using citric acid in an interactive mixture is obviously something we have a real issue with. And again, even if that were correct, it didn't suggest the particular form that is in Claim 6, the claim that we're talking about now, where the citric acid is a carrier particle with the buprenorphine adhered to it in an interactive mixture. Another finding you might hear activists refer to is that a person of ordinary skill would have known how to form an interactive mixture. That's the question you asked earlier, Judge Stowe. Yes, that, again, is true, but that says nothing about specifically forming this claimed structure that was key to the allowance of the claim and, in fact, is the thing that results in the unexpected bioavailability increase seen in the claimed product. So no amount of sort of creatively looking at the reference or chopping or editing the court's opinion and the record will lead to a conclusion or evidence that the record suggests a citric acid carrier with a buprenorphine. The only thing that the court relied upon to fill that hole was the diary testimony. And as we discussed, that testimony, one, does not lead to the claimed structure at all. All he said was that it was of the right size and that it would be a carrier particle, and it is totally unsupported by the prior argument. So your point is that it's unsupported, and what's more, it doesn't explain why one of ordinary skill in the art would make the modification. Exactly, exactly, you're right. And cases like Cephalon stand for the proposition that unsupported expert testimony should not be relied on to invalidate a patent, especially when that testimony is directed to the key claim element. Now, we had a discussion in briefs regarding this question of inherency. That was not an issue below, right? It wasn't an issue below. It was. But the way the court decided the case, by reliance on this diary testimony, that it, quote unquote, would form the interactive mixture, is arguably and could only be an expression of an inherent formation, since none of the prior art that they relied on resulted in the claim structure. So there must be some assumption that when these things are combined, it would inherently form. I don't see where the district court said that, to be honest. I read the district court's opinion, and I don't see where she said that necessarily this is what would happen, which is what's required for inheritance. She absolutely did not. But in addressing what one possible explanation for her reliance on Dyer for this important limitation when the prior art doesn't disclose it, we address the possibility that the court must have assumed that this thing was inherent, because it certainly isn't there in the prior art. Let's hear from the other side. We'll save you rebuttal time. Mr. Lombardi. May it please the court. Your Honor, I'll take counsel's lead and address the support for the use of citric acid as a carrier particle in this mixture. Our position, as the court knows, is that it was supported by the record, not just by Dr. Dyer, but by the prior art references. And so here's the way it went in summary, and I'm happy to point you to specific references. There was art about interactive mixtures, which taught that an interactive mixture should be used with buprenorphine and naloxone in a sublingual tablet, which is precisely what we have here. That art makes clear that you must have a carrier particle. Carrier particles are essential to interactive mixtures. On the other hand, you have the citric acid art, which I call the citric acid art, but art which shows that citric acid should be used in any buprenorphine or buprenorphine and naloxone combination. Can I ask a question about that? Yes. I understand from reading all the briefs and the prior art that the citric acid could have been in the tablet as either a micronized particle or as part of the interactive mixture. Is that right? May I just ask which tablet are you referring to? Are you talking about the suboxone tablet? I'm just asking about your combination. The problem I'm having is one where I understand you're saying it would have been obvious to have an interactive mixture. It would have been obvious that you'd want to have citric acid. My stumbling block is would you want to have citric acid as the carrier, or would it be possible to have it as a micronized element? Excuse me. I have an electronic background. That's my stumbling block. Could you address my technical question? I'll answer your question first, which is yes. Technically, it could be in as micronized or some other form than as a carrier particle. We believe it's taught that it should be a carrier particle in this instance because an interactive mixture, the art strongly teaches use of an interactive mixture. Interactive mixtures must have carrier particles. Citric acid is taught to be used with buprenorphine and naloxone and meets the definition of a carrier particle. And Dr. Dyer testified that citric acid would help to enhance the bioavailability both by acting as a pH modifier, which is how it was used in the art, and as a carrier particle. But what is that in the prior art? I mean, this is the problem, isn't it? It turns out, we're told, apparently undisputed, that there was, I think the words were, surprising bioavailability. Where in the prior art are we led to understand that if you use citric acid in this form, you will get surprising bioavailability beyond what you had before? Other than a witness saying, well, I'm smarter than anybody, so it doesn't surprise me. Well, and that was not exactly what the witness said, Your Honor, but I take it you're going to the unexpected results question. Well, this is a factor in the overview to understand the correctness of the decision. Yes, Your Honor, that's absolutely correct. And the interactive mixture would have been expected to improve bioavailability. That's what the interactive mixture art taught, and it taught that specifically about buprenorphine and naloxone combinations, that you should use them in an interactive mixture in order to increase bioavailability. And that you'll do better with citric acid than any other of the standard adjuvants? Your Honor, I will confirm what counsel said before and what we've said in our briefs. There is no piece of prior art that was presented that says citric acid is a carrier particle or should be used as a carrier particle. But I don't believe that's required under the law. We're not required to have a document that says everything in an obviousness case. Now, if this were anticipation, clearly we would. It's not required if it was obvious to do. This is what I'm trying to get to. Yes, and it was obvious, Your Honor, because the art teaches that you need carrier particles. Moreover, the art teaches, for instance, the 4-4-3 patent, that you're not limited to one carrier particle or any number of carrier particles. For instance, the 4-4-3 patent teaches multiple carrier particles can be used in this interactive mixture. So the idea that because we know in the art that particular substances were used as carrier particles doesn't mean that citric acid would not also be appropriate as a carrier particle in the same mixture. Citric acid becomes relevant because it's used in every single commercial formulation that uses buprenorphine. So when a person of skill in the art is looking at suboxone, the prior art tablet compound, and saying we're going to make an interactive mixture from the suboxone, the person of skill in the art would see that citric acid was there, that it meets the definition of a carrier particle, and that therefore it can be used as a carrier particle and should be used. Where do you get the should be used? That's the part I'm having trouble with. I can follow you along to maybe it could be used, but where you get to, and it should be used. I don't see any evidence of the relevant to support that, not even your expert, to be honest. Well, just to go to the expert point, Your Honor, I'll just point you to A6684 of the transcript, of the appendix, excuse me, where he said that citric acid would help to enhance bioavailability acting both as a pH modifier and as a carrier. And so he's saying that you use citric acid because it helps to increase bioavailability in two ways. One way that had been specifically used by prior art combinations, which is as a pH modifier. I apologize. I didn't get there as quickly as you did. Yes, it would be. I'll be more specific. It's 6684, and I can give you the lines, 427, page 427, within line 23 to 428, line two. And so what he's saying, Your Honor, is that citric acid, a person of skill in the art, who's using an interactive mixture, wants carrier particles. You want carrier particles because that's what makes an interactive mixture work. You look at suboxone, and it provides ingredients. You want to use those ingredients because you know they work together, and specifically you want to use citric acid because you know citric acid already has a positive effect on bioavailability because it's a pH modifier. Could it have been micronized and not been a carrier in the interactive mixture? Yes, I believe that was Your Honor's earlier question. If I wasn't clear, yes. Is there a testimony that explains why using it as a carrier over being micronized would have been advantageous for any reason? Well, it was the testimony that you'd want to use an interactive mixture, Your Honor, and really the fundamental invention here, I would submit, is deciding to use an interactive mixture with buprenorphine and naloxone. That was the fundamental invention here, and that was the 443 patent, which taught that. Then once you had that fundamental idea, which is the structural arrangement in question, it is much less novel, it is not novel in our view, to say that citric acid should be the carrier particle. You were going to use, Opposa was going to use citric acid in any of that. Can I ask you this? I'm not a chemist, so I don't really get a lot of this stuff, but this notion of interactive mixtures, it's not confined to opioid treatment substances. No, it's not, Your Honor. It's used throughout the pharmaceutical industry. It is, Your Honor. And the notion of using citric acid to vary pH balance, I assume, is kind of widely accepted. It is, Your Honor. Is there, I mean, if it's so, if both of those things are really well known, then one would think if citric acid were routinely, or it was obvious to use it as a carrier particle, you could have found some reference that used it. Well, Your Honor, the- Your expert didn't even testify that he was familiar with this industry and that citric acid was routinely used as a carrier particle in our active mixtures. He just said it's the right size and it could be used. Well, you're right, Your Honor, in terms of your characterization of the record. There was not citric acid used as a carrier particle that was in the record. How do we know, then, that this wasn't the first time ever somebody said, oh, we use citric acid to alter pH all the time, but if we also use it as a carrier particle, it's going to have unexpected results, since all we have is your conclusory testimony from your expert. Or you can take out the word conclusory if you want to object to it. I mean, there's no single prior art reference that talks about citric acid as a carrier particle, and if it would have been so obvious to use it that way, you would think you would have found something. Well, the fact that citric acid had never been used as a carrier particle, I would submit, does not mean that it was not obvious to use citric acid as a carrier particle in this instance, Your Honor. And what makes this instance different is that citric acid is an ingrained part of all the suboxone, all the buprenorphine and naloxone combination products and the buprenorphine products that have ever been out on the market. So what you end up with is citric acid is part of a limited number, I believe 12 ingredients in suboxone. The person of skill and the art needs carrier particles and is looking at suboxone to see what the carrier particle could be. That's why the definition of carrier particle is important and would lead the person of skill and the art to that carrier particle, the citric acid. The definition of carrier particle is a broad one, Your Honor, and it's because this is a structural arrangement. This is not an interactive arrangement. You may have issues in some pharmaceutical cases where there's concern about how things interact in the human body and what might happen in unpredictability. There's nothing in the interactive mixture art about that. The interactive mixture art simply says that if you're an appropriate size and you're water soluble and you're pharmaceutically acceptable, it will work as a carrier particle. And given that you want to have more than one carrier particle, the fact that citric acid is taught in the art, consistently taught in the art, as being in buprenorphine and buprenorphine. But never consistently taught in the art as being a carrier particle. Are you basically making some kind of argument that because there's a limited set of ingredients here, it would have been obvious to try all of the ingredients that could have been a carrier particle? No, my argument simply is that a person of skill in the art looking at the ingredients would want carrier particles, as many carrier particles as possible, and would recognize that citric acid falls within that definition. And that was the position at trial. And Dr. Dyer, in addition, said that using citric acid as a carrier particle would improve bioavailability, both as a pH modifier and as a carrier. Now, in an obviousness case, Your Honors, there are going to be, or frequently it's the case, that there are situations where there is a portion or a combination that has never existed before. And so you have to rely on, for instance, testimony in order to make your case. We're not required to have a document that says every aspect of the invention. What we're required to do is show that there would have been a motivation to combine, which I think the record does show. And that combination had a reasonable expectation of success. And we've also got testimony to that effect as well. I believe I've addressed the points that were raised by my colleague. If there are other questions, of course, I'm happy to answer them or delve into another topic. Any more questions? Any more questions? Okay. Thank you, Mr. Lombardi. Mr. Lenny. Your Honor, I don't have much. I'm sorry, Mr. Taylor. One point with this whole definition of carrier particles. The definition of carrier particle is broad. And that is broad enough to encompass almost everything that were in these prior art compositions, such as suboxone. There's no suggestion in the prior art to use citric acid as the carrier particle in an interactive mixture, in the manner that the inventors used it. In fact, if you look at what the interactive mixture art used, they used other materials that were in the suboxone-type products as the carriers, mannitol and lactose. Those are the ordinary carrier particles that people use. It was unordinary. It was special when the inventors decided to choose citric acid as a carrier particle. And doing that resulted in a surprising result. That's all I have, Your Honor. If you have any questions. Any questions? Thank you, Mr. Taylor. Mr. Lombardi, the case is taken under submission.